## MOSS et al. v. CITY OF PITTSBURGH.

(Circuit Court of Appeals, Third Circuit. January 15, 1913. Rehearing Denied March 6, 1913.)

### No. 1,649.

MUNICIPAL CORPORATIONS (§ 225*)—PROPERTY—CONDITIONS SUBSEQUENT IN DEED—UNAUTHORIZED ACTS OF OFFICERS.

The city of Pittsburgh, which, under the law of Pennsylvania governing cities of the second class (Act March 7, 1901; P. L. 20), can lease or sell and convey real estate only by action of the mayor and councils, cannot be deprived of the title to valuable property donated to it for market purposes, on condition that title should revert if it was used for any other purpose, by the unauthorized action of administrative officers in permitting a part of the property to be used in certain seasons as a playground, and in paying a part of the expense of maintaining such playground from general appropriations made by councils for such purposes.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 626–641, 643; Dec. Dig. § 225.*]

In Error to the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Action at law by Frank H. Moss and others against the City of Pittsburgh. Judgment for defendant, and plaintiffs bring error. Affirmed.

For opinion below, see 178 Fed. 605.

Asa Leroy Carter, of New York City, for plaintiffs in error.

Charles H. Burr, of Philadelphia, Pa., and Charles A. O'Brien, C. Elmer Bown, and Lee C. Beatty, all of Pittsburgh, Pa., for defendant in error.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

J. B. McPHERSON, Circuit Judge. This is an action of ejectment brought by certain heirs of James Adams to recover possession of real estate from the city of Pittsburgh. Their ancestor conveyed the land in fee nearly 80 years ago to the Northern Liberties of Pittsburgh, a borough that is now united to the city; but the deed contains a condi-

---

tion subsequent, and the plaintiffs aver that the city has recently broken the condition:

"Provided always nevertheless, and it is expressly covenanted and agreed by the said parties of the second part [the borough] for themselves and their successors to and with the said parties of the first part [James Adams and his wife], their heirs, executors and administrators, and it is hereby declared to be one of the express provisions and conditions of this grant that they, the said parties of the second part, and their successors, shall and will hold, occupy, use, possess and enjoy the said described lots and pieces of ground hereby granted or intended so to be, with the appurtenances, as a market place and for the purposes of a public market for the use of the citizens of the borough aforesaid, and the same is hereby appropriated solely and exclusively for that purpose, and for no other purpose whatever: Provided, that the said parties of the second part are hereby permitted to dig and excavate cellars under and for the use of stalls in the said market, and build, put up and erect, over part of the market house hereinafter mentioned to be built and erected on the lots aforesaid, a suitable and convenient council chamber for the meetings and use of the burgess and council aforesaid, and for no other purpose whatever, the said chamber to be constructed so as not to obstruct the free use and enjoyment of the market place aforesaid; and it is hereby covenanted and agreed by the said parties of the second part, for themselves and their successors, to and with the said parties of the first part, their heirs, executors and administrators, and it is hereby expressly declared to be a further provision and condition of this grant, that the said parties of the second part will and shall immediately build and erect a suitable and convenient market house on the lots aforesaid, to be used as a public market house, as aforesaid, and that they, the said parties of the second part, or their successors, shall and will not bargain, sell, convey, lease, dispose of, or appropriate any of the said described lots hereby granted or any part thereof to or for any other purpose than that of a public market and the purposes specified, as aforesaid; and it is hereby covenanted and agreed, and it is hereby expressly declared to be another condition of this grant, that if the said parties of the second part or their successors shall at any time hereafter bargain, sell, convey, lease, dispose of or appropriate the said described lots hereby granted or any part thereof, or the buildings thereon erected or intended so to be, to any person whatsoever or for any other purpose than that specified, as aforesaid, then and in such event this indenture and the estate hereby granted shall cease and become null and void and of no effect, and the said estate and lots and pieces of ground hereby granted, with the appurtenances, shall instantly revert to the donor and his heirs. * * *"

The trial ended in a compulsory nonsuit, and the only question that needs attention now is whether the learned judge should have set the nonsuit aside. The following facts are undisputed: The land in controversy is a tract 65 feet wide by 200 feet deep, and extends north and south from Penn avenue to Liberty street. A public thoroughfare, Spring alley, which parallels the two streets just mentioned, has always divided it nearly in half. A market house stands on the part fronting Penn avenue, but the part fronting Liberty street has always been vacant and unimproved, and its only use in connection with the market has been to afford convenient standing room for the horses and wagons of persons in attendance. In the years 1907, 1908, 1909, 1910, the director of public works permitted the Pittsburgh Playgrounds Association, a private corporation not connected with the city, to use the open square between Spring alley and Liberty street as a childrens' playground; and the expenses of the association for equipping the square, employing a watchman, and providing the services of

two or three teachers were paid out of the treasury of the city, with the sanction of the comptroller. Moreover, certain preliminary work in preparing the square for a playground was ordered by the director, was performed by employés of the city, and was also paid for out of the treasury. These acts and payments are said to furnish sufficient evidence to justify a jury in finding that the city had appropriated part of the tract to another purpose than a public market; the result being, so the plaintiffs argue, that the title has reverted to the heirs of James Adams. The use of the market house was not interfered with, and the playground was given up in 1910.

After a thorough examination of the record, we regard the evidence as insufficient. The plaintiffs' case is well enough as far as it goes, but it falls short in a material matter. There is no proof that the councils of the city authorized the acts referred to, either directly or by delegation of power; and we think it cannot be successfully contended that the unauthorized conduct of administrative officers can operate to divest the city's title to valuable property. No ordinance directed that the use of the property should be changed, and, so far as appears, no money was specifically appropriated for the purposes referred to in the preceding paragraph. All that councils did was this: When appropriations were made for the respective years in question, each ordinance contained a general item setting aside in advance, as required by law, a lump sum for recreation purposes; but there was no appropriation to the Playgrounds Association, even if the Pennsylvania Constitution would have allowed it, and, except in 1907, there was no specific designation of any ground. The ordinance for 1907 appropriated $36,000 for "recreation grounds, including all balances from prior years, as per following schedule." In this schedule item 9 was:

"For maintenance of small playgrounds in various sections of the city, including West End, Hazelwood, and Soho Playgrounds opened in 1906, $5,200."

But the grounds named are in a different quarter of the city, and it did not appear where these "small playgrounds" were situated. The ordinance for 1908 merely appropriated $33,100 for "recreation grounds"; the ordinance for 1909 appropriated an amount not specified in this record for "recreation purposes"; and the ordinance for 1910 appropriated $65,610 for "recreation grounds." There is nothing in evidence to show that councils ever intended that any part of these appropriations should go to the square in question, and nothing to show that their attention was ever directed to the fact that some of the city's money was being spent for this particular object. No doubt the director of public works and the city comptroller lent their authority to the payment of money out of these several items for the maintenance of the square as a playground; but we need not point out that their acts can impose no estoppel upon councils, at least in the absence of evidence that would bring home to the municipal legislature notice of what these officers were doing. For all that appears, councils may have scrupulously refrained from including this square among the objects to be benefited by the appropriations in question; certainly it is nowhere shown affirmatively that such inclusion was intended.

Nevertheless, if, as is now argued, the work done by order of the director and the payments made under the sanction of the city comptroller are sufficient to burden the city with every inference that can possibly be drawn from these acts, the result may be that a mere mistake, or even the willful misconduct, of these subordinate officials has committed the city to the very position that councils had carefully tried to avoid.

It was not within the statutory or the accustomed powers of such an official as the comptroller or the director of public works to transform a public market into a playground. The Pennsylvania act of 1901 (P. L. 20), regulating government in cities of the second class (to which Pittsburgh belongs), will be searched in vain for such power, express or implied. On the contrary, the power "to purchase and own grounds for, and to erect and establish, market houses and market places" is expressly given to councils, and is to be exercised by ordinance (article 19, § 3, par. 28); and if the previous "laws relating to parks and condemnation of land for park purposes" (which article 4, § 1, declares shall "remain in full force") are believed to remove this subject from the control of councils, to whom it would ordinarily be intrusted, we can only say that such laws were not referred to at the trial and have not been quoted at this hearing. Apparently, article 19, in sections 2 and 3, shows clearly where the power to alienate the city's property is lodged, and how it is to be exercised. The power—

"To purchase and hold real and personal property for the use of the city;
"To lease and sell and convey any real or personal property owned by the city, and to make such order respecting the same as may be conducive to the interests of the city"

—is given to the mayor and councils, and (as might be antecedently supposed) is to be exercised by ordinance. No doubt an executive officer in charge of a department represents a city for many purposes, and his acts may make the city liable; but, in order that such a result may follow, he must be acting within the scope, or at least within the apparent scope, of his office. In the present case councils alone could sell, or lease, or appropriate, or dispose of, the property in question. They might take action either directly or by a proper delegation of power; but no administrative officer could bind the city in this regard unless his act had the authority of councils behind it. Of course, councils might ratify an official's unauthorized act; but the ratification must proceed from councils, and not from some other executive officer.

It is, perhaps, worth noting, also, that section 12 of the act of 1874 (P. L. 234) refers to cities generally; and expressly enacts that no part of their property shall be sold or disposed of in any manner by any official, agent, or employé without the consent of councils. It is not unlikely that this provision may be still in force; for the repealing clause of the act of 1901 (article 20, § 4) does not refer to it specifically, but only repeals generally such laws as may be inconsistent with, or may be supplied by, the later act. If section 12 be in force, it is evidently of much importance.

It should also be borne in mind that, since the plaintiffs are seeking to enforce a forfeiture, they must offer clear evidence before they can succeed. This they were unable to do, and we do not feel bound to help them out, either by supposition or by presumption.

The judgment is affirmed.